2011 Ark. 350

Roberta MORNINGSTAR and Doyle Shirley, on Behalf of Themselves and All Taxpayers Similarly, Situated Appellants

v.

Mike BUSH, in His Official Capacity as Mayor of The City of Hot Springs, Arkansas; and Peggy Brunner–Maruthur, Elaine Jones, Cynthia Keheley, Carroll Weatherford, Rick Ramick, and Tom Daniel, in Their Official Capacities as Members of the Board Of Directors of The City of Hot Springs, Arkansas, Appellees.

No. 11–143.

Supreme Court of Arkansas.

Sept. 15, 2011.

Howard Gregory Campbell, Little Rock, for appellants.

Brian Wade Albright, Hot Springs, for appellees.

KAREN R. BAKER, Justice.

The Board of Directors of the City of Hot Springs adopted Ordinance No. 5629 (the "Ordinance") on January 8, 2008. The ordinance established a Stormwater Utility Fund (the "Fund") and imposed a Stormwater Utility Fee (the "Fee") on municipal utility accounts within the City of Hot Springs's (the "City") corporate limits. The Ordinance fixed a fee of $6 per month for commercial and industrial accounts and $3 per month for residential accounts. On appeal, appellants assert that the circuit court's decision upholding the ordinance is erroneous (1) because the Fee is contrary to Ark.Code Ann. § 14–235–223(a)(1) and constitutes an illegal exaction and (2) because the Fee constitutes a tax, which required voter approval. This case requires the court to interpret the Arkansas Code and Constitution, involves an issue of substantial public interest, and requires clarification or development of law. Our

jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(b)(4), (5), and (6) (2011). We find no error and affirm.

Under section 208 of the Clean Water Act, 33 U.S.C. § 1288, certain public entities, including municipal corporations, were charged with unfunded federal and state mandates promulgated through the Environmental Protection Agency ("EPA") and the Arkansas Department of Environmental Quality ("ADEQ"). The Clean Water Act requires municipalities to obtain a National Pollution Discharge Elimination System Permit ("NPDES Permit") for discharges from municipal storm systems. The Act permits states to develop a program for obtaining the NPDES Permit. The EPA promulgated certain regulations that established a comprehensive Stormwater Management Program to manage the quality of stormwater passing through municipal separate stormwater systems ("MS–4").

The City applied for an NPDES Permit and was issued a regulated, small MS–4 general permit effective on May 28, 2004. The City created a Stormwater Utility in order to meet the regulations and mandates from the EPA and the ADEQ that was initially funded by the City's general fund at an expense of between $80,000 and $100,000 per year. The EPA set forth additional mandates that were required to be completed by May 2009. The City determined in 2007 that it lacked sufficient funds in its general-revenue fund set aside to implement the new mandates. In 2008, the City established the Fee to fund the creation and operation of the separate utility system for the Stormwater Utility program, including covering the costs of implementing the additional mandates.

The ordinance was enacted pursuant to Ark.Code Ann. § 14–235–223(a)(1) (Repl. 1998), which confers the power on the city council to establish rates or charges for the use and service of a stormwater utility or other similar structure used by a city to dispose of or treat stormwater. The City provides water, wastewater and/or sanitation services for certain municipal utility-account customers. The City also provides water and wastewater-utility systems for customers outside the city limits. Approximately 40% of the municipal-utility accounts receiving water services from the City are for locations outside the city limits and are not required to pay the Fee, and approximately 50% of the municipal utility-account customers receiving wastewater services from the City are for locations outside the city limits. The City does not have a stormwater-utility system beyond its city limits. Garland County has its own MS–4 Permit for areas outside the city limits. The City did not require residents inside the city limits who use wells exclusively for water and septic tanks for sewerage to pay the Fee, and owners of undeveloped property and stand-alone public parking lots in the downtown area were not charged the Fee.

The stormwater program is designed to manage the quality of stormwater from the City's stormwater-drainage program. Polluted stormwater-runoff deposits into Hot Springs Creek and Stokes Creek, which are the major drainage conveyance creeks for the City's stormwater drainage systems and which deposit into Lake Hamilton. Lake Hamilton is the primary drinking water supply for the City's municipal utility accounts for both inside and outside the city limits. The City's board of directors intended to protect Lake Hamilton as the City's drinking water supply source and as a major tourist attraction, generating millions of dollars in revenue, for the community.

All revenue generated by or on behalf of the Fee is deposited into the Fund, to

be used exclusively for the operation of the stormwater utility and storm-related equipment, construction, material, supplies, or services, including storm-related disaster, recovery, and emergency preparedness. For the year ending December 31, 2008, costs of the Stormwater Utility service were $414,698, and total revenues received were $634,009. For the period ending September 30, 2009, costs of the service were $206,771, and revenues were $521,658. The City's expert, Dan V. Jackson, testified that the base rate the City charged was consistent with the Costs of Services Model that he prepared for the City; that it is similar to other models he prepared for other clients; that the Fee is lower than that in 47 of the 70 cities surveyed in a 2007 Southeastern Stormwater Utility survey; that the Stormwater Utility was being operated as a separate utility; that the Fee was fair, reasonable, and bore a reasonable relationship to the benefits conferred; and that the Fee must be used exclusively to fund the Stormwater Utility.

The standard of review on appeal from bench trials is not whether there is substantial evidence to support the finding of the court, but whether the judge's findings were clearly erroneous or clearly against the preponderance of the evidence. Ark. R. Civ. P. 52(a) (2011); *Optical Partners, Inc. v. Dang*, 2011 Ark. 156, 381 S.W.3d 46. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that a mistake has been committed. *Dang*, 2011 Ark. 156, at 14, 381 S.W.3d at 55. Disputed facts and determinations of credibility are within the province of the factfinder. *Id.* However, a trial court's conclusions of law are given no deference on appeal. *McWhorter v. McWhorter*, 351 Ark. 622, 97 S.W.3d 408 (2003).

Appellants first assert that the City failed to comply with the authorizing legislation, Ark.Code Ann. § 14–235–223(a)(1), when it implemented the Fee, and therefore, the Fee constitutes an illegal exaction. An illegal exaction is any exaction that is either not authorized by law or is contrary to law. *Robinson v. Villines*, 2009 Ark. 632, 362 S.W.3d 870. There are two types of illegal-exaction cases: (1) "public funds" cases, where the plaintiff contends that public funds generated from tax dollars are being misapplied or illegally spent and (2) "illegal tax" cases, where the plaintiff asserts that the tax itself is illegal. *Id.* Appellants assert that this is an illegal-tax case. They argue that the Fee is an illegal exaction because the City did not comply with Ark.Code Ann. § 14–235–223(a)(1), given approximately 40% of the 25,000 sewage customers of the City are not required to pay the Fee.

The authorizing legislation states as follows:

> The council of the municipality shall have power, and it shall be its duty, by ordinance to establish and maintain just and equitable rates or charges for the use of and the service rendered by the works, to be paid by each user of the sewerage system of the municipality.

Ark.Code Ann. § 14–235–223(a)(1). "Works" are defined to include:

> (1) The structures and property as provided in § 14–235–203;
>
> (2) Storm water management;
>
> (3) The creation and operation of a storm water utility;
>
> (4) The creation and operation of a storm water department; and
>
> (5) Other like organizational structures related to the disposal or treatment of storm water by municipalities.

Ark.Code Ann. § 14–235–201 (Supp.2011).

Our basic rule of statutory construction is to give effect to the intent of

the legislature. *Dachs v. Hendrix*, 2009 Ark. 542, 354 S.W.3d 95. Where the language of a statute is plain and unambiguous, this court will determine legislative intent from the ordinary meaning of the language used. *Id.* We construe the statute just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id.*

Appellants assert that the phrase "to be paid by each user" means that any beneficiary of the Stormwater Utility system must pay a fee. However, reading the subsection as a whole, it further adds the phrase "of the sewerage system of the municipality." It does not state that the fee must be paid by any beneficiary, whether intended or unintended, of the sewerage system, and the Code does not define "sewerage system" to distinguish between the wastewater sewer system and the stormwater sewer system. The City contends that its MS–4 Permit is limited to the City, and fees may not be imposed outside the City's corporate boundaries. The circuit court found that imposing the Fee only upon those customers over which the City had jurisdiction to operate the Stormwater Utility, even if some customers outside the city limits may derive some benefit from the service, did not constitute an illegal exaction; the circuit court did not find that the City's imposition of the Fee violated the provisions of Ark.Code Ann. § 14–235–223(a)(1). Under these facts, we cannot say that the circuit court's findings were clearly erroneous.

In order to bring an illegal-exaction claim based on an "illegal tax," the exaction must be a tax and not a fee. Appellants' next argument is that the Fee is a tax rather than a fee. This court has distinguished between a fee and a tax as "government imposes a tax for general revenue purposes, but a fee is imposed in the government's exercise of its police powers." *Harris v. City of Little Rock*, 344 Ark. 95, 105, 40 S.W.3d 214, 221 (2001) (quoting *City of Marion v. Baioni*, 312 Ark. 423, 425, 850 S.W.2d 1, 2 (1993)). While a city can assess a fee for providing a service without obtaining public approval, a tax cannot be levied unless it has received approval by the taxpayers. *See* Ark.Code Ann. § 26–73–103(a) (Repl.2008). The court is not bound by a city's calling an exaction a "fee" and not a "tax." *Harris*, 344 Ark. at 105, 40 S.W.3d at 221. We look to the true nature of the exaction rather than its name to determine whether it is a fee or a tax. *Id.*

An ordinance is entitled to the same presumption of validity that legislative enactments receive. *Harris v. City of Little Rock*, 344 Ark. 95, 40 S.W.3d 214 (2001). Thus, similar to a statute, an ordinance is presumed constitutional, and the burden of proving otherwise is upon the challenging party. *Id.* Where the complainant offers no proof to support the claim that the ordinance is unconstitutional, our inquiry is "limited to the face of the ordinance, with every presumption being in its favor." *Id.* at 104, 40 S.W.3d at 220 (quoting *Bd. of Adjustment of Fayetteville v. Osage Oil & Transp., Inc.*, 258 Ark. 91, 93, 522 S.W.2d 836, 838 (1975)).

The exercise of a municipality's taxing power is distinguishable from the exercise of its police power: taxing power is usually exercised to provide funding for public services at large, while police power is usually exercised to cover the cost of administering a regulatory scheme or providing a service. *See* 16 Eugene McQuillin, *The Law of Municipal Corporations* § 44.02 (3d ed.2003). This court has determined that an annual sanitation charge of $4 per business and residence to pay for fogging the city three times a year with an insecticide was a fee "for services to be rendered" and not a tax. *Holman v. City of*

*Dierks,* 217 Ark. 677, 678, 233 S.W.2d 392, 393 (1950). The court has also concluded that a "public safety fee" added to the water bill of each residence or business for the purpose of increasing the salaries of the city's policemen and firemen was a tax because it was for the cost of maintaining a traditional governmental function and service already in effect and not for a special service. *City of North Little Rock v. Graham,* 278 Ark. 547, 647 S.W.2d 452 (1983). The *Graham* court stated that the "public safety fee" was "a payment exacted by the municipality as a contribution toward the cost of maintaining the traditional government functions of police and fire protection" and "not for a specific, special service such as the spraying for insects[.]" *Id.* at 549, 647 S.W.2d at 453 (citing *Olustee Co-op. Ass'n v. Oklahoma Wheat Utilization Research & Dev. Comm'n,* 391 P.2d 216 (Okla.1964)).

The court in *Graham* noted that the fee was a means for paying for services already in effect, which appellants argue is the purpose of the Fee in this case. The circuit court concluded that the services required in this case came about only after the mandates as a result of the Clean Water Act and NPDES Permit.[1] In the exercise of its police powers, the City established the Stormwater Utility, and the Fee charged is not a tax under Ark. Code Ann. § 14–235–223(a)(1). Therefore, we conclude that the circuit court's finding that the Fee was not intended as a means of paying for already existing services is not clearly erroneous.

A fee must be fair and reasonable and bear a reasonable relationship to the benefits conferred on those receiving the services. *Baioni,* 312 Ark. at 426, 850 S.W.2d at 2. Appellants argue that the fact the revenue generated by the Fee exceeded the operating costs of the Fund leads to the conclusion that the Fee does not meet this test. However, this court has rejected the assertion that simply because a utility fee generates a surplus in a utility fund, the exaction must be a tax. *See Maddox v. City of Ft. Smith,* 346 Ark. 209, 56 S.W.3d 375 (2001). The City's expert testified that the Fee was reasonable in light of the fees other cities in the region charge for similar stormwater services, and the trial court relied on his testimony. Further, the City properly segregated the Fund for use only for the purposes for which it was created. While the scope of the services may have exceeded the requirements of the mandate, that fact alone is not determinative, as the scope of the services is still within the purposes of the authorizing legislation. We are unable to say to say that the presumption of constitutionality of the Ordinance has been overcome.

Affirmed.

---

1. Appellants state that the City needed additional revenue to fund capital improvements to the existing infrastructure of the stormwater system, but had other budgetary needs, including raises for City employees. This does not compel a conclusion that the Fee is illegal. There is no proof that the Fund was used for such general raises, and improvement to the stormwater system is a valid purpose of the Fund. Indeed, enacting ordinances to generate fees for valid services that are authorized by statute to make up for general budgetary shortfalls is no new vehicle for struggling municipalities and has been upheld when such fees rest on solid legal grounds. *See generally* Mark N. Halbert, Note, *Municipal Law—Utility Franchise Fees—True Nature of Levy Immaterial When City Possesses Statutory Authority; City of Little Rock v. AT & T Commc'n, Inc.,* 318 Ark. 616, 888 S.W.2d 290 (1994), 18 U. Ark. Little Rock L.J. 259 (1996).